UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| **Cheryl Graham,** | ) | Civil Action No.:4:25-cv-10041-JD |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| **Citizens Bank, N.A.** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## COMPLAINT

1. This is an action brought by Plaintiff, Cheryl Graham, for actual, statutory and punitive damages, attorneys' fees, and costs for Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq., (hereinafter "FCRA"). Plaintiff also seeks compensatory and punitive damages for the Defendant's violations of South Carolina common law set forth herein.

2. The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3. Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

1

4. To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681s-2b, which is a cornerstone provision of the FCRA.

5. One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

6. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

7. This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p, and 28 U.S.C. §1331, §1332 and §1367.

8. Venue is proper in the Florence Division because the Plaintiff resides in Marion

County and the Defendant transacted business in this division.

## PARTIES

9.      Plaintiff, Cheryl Graham, is a resident and citizen of the State of South Carolina, Marion County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

10.     Defendant Citizens Bank, N.A. (hereinafter referred to as "Defendant") is a corporation and may be served with process through its registered agent for service of process, Corporation Service Company, 508 Meeting Street, West Columbia, SC 29169. In all respects and at all times relevant herein, Defendant was doing business in the state of South Carolina and in the Florence Division.

## FACTUAL ALLEGATIONS

11.     On September 21, 2022, Plaintiff signed a System Purchase and Services Agreement with Vivint Smart Home (hereinafter referred to as "Vivint") for a security system for her elderly aunt.  Plaintiff's aunt lived alone, and the security system was a way for her to feel safe in her home.  Financing for the security system was through Defendant's Citizens Pay Line of Credit, Account ending 7070 (hereinafter referred to as the "Account").

12.     In December 2022, three months after the security system was installed, Plaintiff's aunt passed away.

13.     Plaintiff contacted Vivint to inform them of her aunt's passing and to close the Account since the security system was no longer needed.  Vivint referred Plaintiff to its Exception Review Team ("ERT"). Plaintiff provided Vivint's ERT with a copy of her aunt's death certificate.  ERT agreed to close the Account.

3

14. On February 13, 2023, Defendant viewed Plaintiff's Experian credit report.

15. Thereafter, Plaintiff received a notice from ERT confirming the Account was cancelled as of February 27, 2023, and that "[a]ll billing and monitoring of your Vivint system has been disabled. – The Vivint Team"

16. On April 4, 2023, Defendant viewed Plaintiff's Equifax credit report.

17. On April 10, 2023, Defendant viewed Plaintiff's Experian credit report.

18. On April 21, 2023, Plaintiff received an email from Vivint with a return shipping label attached for Plaintiff to return the security equipment directly to Defendant.

19. On May 4, 2023, Plaintiff took the package containing all of the security equipment to FedEx for delivery to Defendant using the shipping label provided by Vivint.

20. On May 9, 2023, Defendant received the security equipment package from Plaintiff.

21. With Vivint having cancelled all monitoring services and closed the Account, and Plaintiff having returned all of the equipment directly to Defendant, there should have been no further charges whatsoever to Plaintiff.

22. However, despite notice from Vivint that the Account was closed, and receipt of all of the security monitoring equipment from Plaintiff, Defendant continued to wrongfully draft monthly payments of $45.39 out of Plaintiff's checking account.

23. On June 5, 2023, Plaintiff received an email from Defendant, stating the statement for the Account was ready for a payment of $45.39, which was due by July 1, 2023. The email also stated that since Plaintiff was enrolled in autopay, Defendant would take the payment directly from Plaintiff's checking account. The email noted the Account had a balance of $2,360.13.

4

24. After receipt of that email from Defendant, Plaintiff immediately called Vivint and confirmed that she did not owe any money on the Account. At that time, Vivint informed Plaintiff the June payment would be refunded to her by Defendant due to the error. To date, Defendant has never refunded the June 2023 payment.

25. Thereafter, in June 2023, Plaintiff went to her bank with documentation to show that the Account was closed and instructed the bank to stop any further attempts by Defendant to draft funds from her checking account.

26. On July 5, 2023, Plaintiff received another email statement from Defendant showing a balance on the Account of $2,314.74 and a payment of $45.39 due August 1, 2023. Defendant also informed Plaintiff that since she was enrolled in autopay, the payment would be automatically drafted out of her checking account.

27. In July, Defendant attempted to draft the payment of $45.39 from Plaintiff's checking account, but was unsuccessful as Plaintiff had stopped all payments to Defendant.

28. On August 2, 2023, Defendant wrongfully drafted a payment of $90.78 from Plaintiff's checking account for the months of July and August. Plaintiff immediately disputed the payment with her bank.

29. On August 4, 2023, Plaintiff received an email from Defendant stating the statement for the Account was ready and that a payment of $45.39, was due by September 1, 2023. The email also stated the Account had a balance due of $2,269.35.

30. On August 10, 2023, on a three-way call with Plaintiff, a representative of Vivint told a representative of Defendant's that the Account was closed, and that they were not to draft any further payments.

31.   On August 10, 2023, Plaintiff's bank credited Plaintiff's checking account for the $90.78 payment previously drafted on August 2nd by Defendant.

32.   On or about September 6, 2023, Plaintiff received an alert that Defendant was reporting the Account as 60-days past due on her credit reports.

33.   As a result of Defendant's reporting of the Account as delinquent, Plaintiff's credit score dropped 108 points from 824 to 716.

34.   On or about September 12, 2023, Plaintiff sent a dispute letter to Equifax ("First Equifax Dispute"), wherein Plaintiff informed Equifax of the events that led to the Account being reported incorrectly on her Equifax credit report. Plaintiff requested the inaccurate late pays reported by Defendant be removed so her credit would be restored to the exceptional standing it was at prior to September 2023.

35.   Equifax received Plaintiff's letter and thereafter forwarded same to Defendant.

36.   On or about September 12, 2023, Plaintiff also sent a dispute letter to TransUnion ("First TransUnion Dispute"), wherein Plaintiff informed TransUnion of the events that led to the Account being reported incorrectly on her TransUnion credit report. Plaintiff requested TransUnion remove the inaccurate late pays from her credit report and restore her credit to its excellent standing.

37.   Upon receipt of Plaintiff's dispute letter, TransUnion forwarded same to Defendant.

38.   On or about September 28, 2023, Plaintiff received Equifax's Investigation Results, wherein Equifax stated that Defendant had verified the Account as accurate. As a result, the inaccurate late pays continued to be reported on Plaintiff's Equifax credit report.

39.   On October 4, 2023, Plaintiff received an email from Victoria Saunders, Executive

6

Resolutions, Proactive Escalation Prevention Department with Vivint. In her email, Ms. Saunders stated, "We are writing to confirm the Vivint monitoring account has already been cancelled and the line of credit has now been submitted for forgiveness and backdate to 02/27/2023," and that Plaintiff could expect a refund in 14-21 days. The email went on to say Vivint was processing a payment to Defendant and that the Account would reflect as being paid off in full on Plaintiff's credit.

40. On or about October 10, 2023, Plaintiff sent a dispute letter to Experian ("First Experian Dispute"), wherein Plaintiff informed Experian of the events that led to the Account being reported incorrectly on her Experian credit report, and requested that the inaccurate late pays be removed.

41. Experian received Plaintiff's dispute on October 17, 2023, and thereafter forwarded same to Defendant.

42. On or about October 18, 2023, Defendant sent Plaintiff a letter stating the Account had been paid in full on October 2, 2023, and closed as of October 18, 2023.

43. On October 28, 2023, Defendant viewed Plaintiff's Experian credit report. At that time, the Account was clearly reporting inaccurate information as it was reporting as 90 days past due and the Account was never past due. Defendant did not take any action to correct its reporting of the Account to show that it was always paid on time and that it was closed with a zero balance.

44. On or about November 7, 2023, Equifax sent Plaintiff the results of its investigation of her dispute. Equifax stated that Defendant updated the Account to report as paid in full, and the "Status" was changed to "Account Closed; was 60-80 days past due."

45. On November 9, 2023, Plaintiff received an alert that her TransUnion credit score dropped another 23 points to 727 due to Defendant's updated reporting of the Account as closed and 90 days late.

46. On November 14, 2023, Defendant again viewed Plaintiff's Equifax credit report, which was still inaccurately reporting the Account as 60-80 days past due. Defendant did not take any action to correct its inaccurate reporting of the Account to show that it was always paid on time.

47. On or about December 4, 2023, Plaintiff received a letter from Discover stating it was not able to provide Plaintiff an offer of credit due to a recent delinquency showing on Plaintiff's Experian, TransUnion, Clarity, and LexisNexis credit files. Discover also informed Plaintiff that its decision was based on Plaintiff's Experian credit score, which was 678. As a result of Defendant's wrongful reporting and verifying of the Account to the credit reporting agencies as delinquent, Plaintiff was denied credit by Discover.

48. On or about February 12, 2024, Plaintiff obtained a new copy of her Experian credit report. The Account was the only derogatory account on Plaintiff's Experian credit file and it was reporting as Paid, Closed, and as 90 days past due as of October 2023.

49. On or about February 13, 2024, Plaintiff obtained a new copy of her Equifax credit report. The Account, the only derogatory account reporting on Plaintiff's Equifax credit report, was reporting as Paid Account/Zero Balance, Account closed, was 60-80 days past due and with a Date of First Delinquency of July 2023. The account status of 60-80 days past due and the date of first delinquency were not accurate.

50. On or about February 12, 2024, Plaintiff obtained a new copy of her TransUnion

credit report. The Account, the only adverse account reporting on Plaintiff's TransUnion credit report, was reporting as Paid, Closed, was 90 Days Past Due in October 2023. All of the derogatory information was inaccurate.

51.     On or about March 5, 2024, Plaintiff disputed the inaccurate information reporting on the Account with both Equifax and TransUnion.

52.     On or about March 6, 2024, TransUnion forwarded Plaintiff its reinvestigation results showing that Defendant made no changes to the reporting of the Account. As a result, the Account continued to be reported inaccurately as Paid, Closed, was 90 days past due.

53.     On or about March 12, 2024, Plaintiff received an email from Defendant stating that it had completed its investigation into Plaintiff's dispute of March 5, 2024. However, Defendant did not correct the information it reported to the credit reporting agencies and the Account continued to be reported as a derogatory account.

54.     On or about March 21, 2024, Plaintiff sent a second written dispute to Equifax ("Second Equifax Dispute"), wherein Plaintiff stated she had obtained a new copy of her Equifax credit report, and it was still inaccurately reporting the Account with late payments for months when no payment was due. Plaintiff requested that all late payments or the entire Account be removed so that her credit report would be correct.

55.     Equifax received Plaintiff's dispute and thereafter forwarded same to Defendant.

56.     On or about March 21, 2024, Plaintiff sent a second dispute letter to Experian ("Second Experian Dispute"), wherein Plaintiff stated she had obtained a new copy of her Experian credit report, and it was still reporting the Account with inaccurate information.

Plaintiff specifically disputed all late payments as the Account was never paid late and the months being reported as late were after the Account was closed and no payment was due.

57. Upon receipt of Plaintiff's dispute, Experian forwarded same to Defendant.

58. On or about March 22, 2024, Plaintiff sent a second written dispute to TransUnion ("Second TransUnion Dispute"), wherein Plaintiff stated she had received TransUnion's investigation results into her dispute which stated "nothing changed" with the Account. Plaintiff again specifically disputed the reporting of the Account as inaccurate as it was reporting no payments for August, September and October of 2023, but no payments were due for those months as the Account had already been paid in full and closed. Plaintiff owed nothing.

59. TransUnion received Plaintiff's dispute and thereafter forwarded same to Defendant.

60. On or about April 17, 2024, Plaintiff obtained a new copy of her TransUnion credit report. Upon review, Plaintiff saw that the Account continued to be reported as Paid, Closed, 90 days past due.

61. On or about April 19, 2024, Plaintiff received the results of Experian's investigation wherein Experian informed Plaintiff that Defendant had verified and updated its reporting of the Account. Unfortunately, the Account continued to be reported as a derogatory account and as 60 days past due as of September 2023.

62. On or about April 25, 2024, Plaintiff sent a third written dispute to Experian ("Third Experian Dispute"), wherein Plaintiff stated she had received Experian's results of its investigation into her dispute, and the Account was still reporting incorrectly. Plaintiff specifically informed Experian that the Account was cancelled in February 2023 and that

no payments were due for August and September of 2023, and thus those months should not be reporting as late.

63. Plaintiff did not receive a response from Experian to her April 25, 2024, dispute.

64. On or about July 11, 2024, Plaintiff sent a fourth written dispute to Experian ("Fourth Experian Dispute"), wherein Plaintiff stated she had not received a response to her April 25, 2024, dispute, and that the Account continued to be reported incorrectly as past due. Plaintiff again reiterated that the Account was closed in April of 2023 and that all of the equipment was returned to Defendant in May of 2023. As no payments were due for July and August of 2023, it was inaccurate for Defendant to be reporting those months as 30 and 60 days late. Plaintiff requested that Experian immediately remove all of the late payments on the Account or delete the Account entirely.

65. Experian received Plaintiff's dispute on July 16, 2024, and thereafter forwarded same to Defendant.

66. On or about July 11, 2024, Plaintiff sent a third written dispute letter to Equifax ("Third Equifax Dispute") wherein she again informed Equifax that the Account was inaccurate as it was reporting two months as past due and no payments were actually due for those months. Plaintiff requested Equifax to either remove all of the late payments on the Account or delete the Account entirely.

67. On or about July 11, 2024, Plaintiff also sent a third written dispute to TransUnion ("Third TransUnion Dispute"), wherein Plaintiff stated she had received the results of TransUnion's investigation into her dispute, and the Account was still reporting with inaccurate information. Plaintiff again reiterated that the Account was closed in April 2023,

11

not November 2023, and that no payments were due for the months that Defendant was reporting as past due.

68. TransUnion received Plaintiff's Third Dispute on July 16, 2024, and forwarded same to Defendant.

69. On or about July 18, 2024, Equifax forwarded a letter to Plaintiff stating it was unable to locate a credit file in its database with the identifying information Plaintiff provided and requested Plaintiff send two items to verify her identity and current address.

70. On or about August 2, 2024, Plaintiff sent Equifax a copy of Equifax's July 18, 2024, letter, together with a copy of a W2, a water bill to verify her address, and a copy of her July 11, 2024, dispute letter. Equifax received this documentation on August 8, 2024.

71. On or about August 2, 2024, TransUnion sent Plaintiff the results of its investigation into her Third Dispute which showed that Defendant had verified the Account as accurate and "no change needed." As a result, the Account continued to be reported as "Paid, Closed, 90 Days Past Due."

72. On or about August 23, 2024, in a final attempt to get her TransUnion credit report corrected, Plaintiff sent TransUnion a fourth written dispute ("Fourth TransUnion Dispute"). In this dispute, Plaintiff again disputed the Account as reporting incorrect and inaccurate information as the Account was never paid late. The Account was closed in April 2023, not November 2023, and no payments were due for August, September, and November of 2023.

73. While Defendant was continuing to publish false information regarding the Plaintiff to the consumer reporting agencies and the public at large, Plaintiff's credit reports were

viewed by Capital One, Syncb/Sams Club Dual Card, Bank of America, Syncb/WalgresnSDC, T-Mobile, Dish Network, Discover Card, Liberty Mutual, WFNA, JPMCB, WF Card Services, WFBNA, TD Bank, SoFi Bank, NA, LexisNexis/Ins/State Farm, and BB&T.

74. To date, Defendant continues to report the Account incorrectly causing Plaintiff ongoing harm.

75. Defendant failed to make a reasonable investigation into Plaintiff's disputes.

## COUNT ONE
**(Fair Credit Reporting Act)**

76. The Plaintiff adopts the averments and allegations of paragraphs 11 through 75 hereinbefore as if fully set forth herein.

77. Defendant violated 15 U.S.C. §1681s-2(b) by failing to investigate the accuracy of the information reported by the Defendant to the consumer reporting agencies.

78. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to fully and properly investigate after receiving notice that the Plaintiff disputed the information said Defendant had provided to a consumer reporting agency.

79. On at least one occasion within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

80. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages, including but not limited to: damage to reputation and

credit reputation, decreased credit score, lost credit opportunities, denial of credit, embarrassment, humiliation, frustration, anxiety, loss of sleep, worry, physical sickness and pain, and mental anguish.

81.     The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

82.     The violations by Defendant were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.  In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

83.     Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorneys' fees from Defendant in an amount to be determined by a jury pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT TWO
### (Fair Credit Reporting Act)

84.     The Plaintiff adopts the averments and allegations of paragraphs 11 through 83 hereinbefore as if fully set forth herein.

85.     On one or more occasions within the past two years, by example only and without limitation, Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing the Defendant's inaccuracies within Plaintiff's credit files with the credit reporting agencies by failing to correctly report results of an accurate investigation to each credit reporting agency.

86. Defendant violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to at least one consumer reporting agency. This includes, but is not limited to, Defendant's failure to report the negative accounts set forth herein as disputed after receipt of a direct dispute from Plaintiff relating to same.

87. Defendant violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the accounts the subject of this action was inaccurate, incomplete, false, and misleading.

88. As a result of Defendant's violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiff suffered actual damages, including but not limited to: damage to her credit and credit reputation, decreased credit score, lost credit opportunities, denial of credit, increased cost of credit, and incurred out of pocket losses. Additionally, Plaintiff suffered humiliation, anxiety, loss of sleep, frustration, worry, physical sickness and pain, and mental anguish, as well as damages for attorneys' fees.

89. The violations by Defendant were willful, rendering it liable for punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1681n. In the alternative, Defendant was negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

90. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorneys' fees, pursuant to 15 U.S.C. §1681n and §1681o.

## **COUNT THREE**
(Defamation)

91. The Plaintiff adopts the averments and allegations of paragraphs 11 through 90

hereinbefore as if fully set forth herein.

92.     During the three years prior to the filing of this Complaint, Defendant willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding the Plaintiff to third parties and the public at large.

93.     Said false and defamatory statements have harmed the reputation of the Plaintiff and/or deterred third person from associating with the Plaintiff.

94.     Defendant communicated to the three credit reporting agencies, and other third parties, false information concerning the Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning the Plaintiff.

95.     Said communications were made to the three credit reporting agencies, to their agents and employees, and to the public at large.

96.     Said communications were false in that the Account was never past due, and Plaintiff did not owe an outstanding balance to Defendant.

97.     At the time said communications were made, Defendant knew, or should have known, the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

98.     As a result of the intentional communications to third parties of the false information, the Plaintiff was caused to suffer injury to her reputation in the eyes of her community and the public, and/or was subjected to ridicule.

99.     As a proximate consequence of said defamation, libel and slander, the Plaintiff was caused to have negative credit reports, held up to public ridicule or shame, denied credit, suffered harm to her reputation and credit reputation, and was made to suffer anxiety, loss

of sleep, anger, fright, worry, physical pain and sickness, and mental anguish for which she claims compensatory and punitive damages.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendant for the following:

A.  Actual and statutory damages from Defendant pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B.  Punitive damages from Defendant pursuant to 15 U.S.C. §1681n(a)(2);

C.  Costs and reasonable attorney's fees from Defendant pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D.  For compensatory and punitive damages in an amount to be determined by a struck jury for Defendant's defamation;

E.  For this matter to be heard by a jury; and

F.  For such other and further relief as the Court may deem just and proper.

*/s/ Penny Hays Cauley*
Penny Hays Cauley, Fed. ID No. 10323
Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
phc917@hayscauley.com

17

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

                                          */s/ Penny Hays Cauley*
                                          Of Counsel

**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**
Citizens Bank, National Association
c/o Corporation Service Company, Registered Agent
508 Meeting Street
West Columbia, South Carolina 29169